The next case, case number 19-8010, M.K. International v. Crown Products & Services and others. May it please the court. Please. Counsel, I hope to reserve three minutes if possible. You're the master of your time. That's my goal, Your Honor. My name's John Walker. I'm an attorney here from Cheyenne, Wyoming. I'm representing the plaintiff, the appellant in this matter, M.K. I grew up in Green River in the early 60s, Wild West. And one of my common activities early on Saturday morning is I'd get up and watch the Westerns. Today we call them old TV Westerns. Then they were new TV Westerns. And eat my breakfast cereal before my folks woke up. And one of the common themes throughout those old TV Westerns was a lawless land, wherein the cattle barons would often take advantage of the homesteaders. But there was always the likes of a Matt Dillon or a Cheyenne Bodie that could come and protect the interests of the downtrodden. Today we have in this Western land some good laws, some excellent solid laws, that are designed to protect people, and I really want to focus on public policy. Counsel, that's an excellent jury argument, but you're not in front of a jury. You're in front of three court of appeals judges, so let's get to that. And I will, Your Honor. I was right there. I was worried you were going to paint me as Matt Dillon and I can't live under that. No, no, and that is my exact point is we don't have the Matt Dillons and Cheyenne Bodies, but we have the laws. And I was just intrigued on how the movie turned out. Well, at the end of the day, Your Honor, the law that I really want to emphasize that was adopted in Wyoming and it incorporated and implemented a case from New Mexico, and it's the implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing requires that neither party, or parties in this instance, commit an act that would injure the rights of the other party to receive the benefit of their agreement. And that's the Wyoming case of shared construction versus HeadQuest. So on this claim, doesn't your claim fail if the defendants acted consistently with the contract? It does not, and let me explain why. And I guess what I'm saying is if the conduct you're complaining about is something that's not prohibited, or maybe even arguably allowed, doesn't that defeat your implied covenant claim? And it does not, Your Honor, and let me explain why. I'm both a trial attorney and I'm a transactional attorney. Many people have commented and said you must be a really good trial attorney because you understand transactional law. My response is no, I'm a pretty darn good transactional attorney because of my trial practice, and I learn of the loopholes and I learn of the issues in putting together a contract. What's the answer to Judge Carson's question? The question is no, because as a transactional attorney and in putting together these contracts, it is beyond my comprehension how you could contemplate and specifically exclude the type of conduct that is engaged in here when parties enter into an agreement. That's not really a question about whether it's beyond your comprehension that the parties could have had such a contract. The question is they had a contract, not what you would have done as a good lawyer, but the contract that we got. And so it doesn't really matter whether the contract is beyond your comprehension or not. What matters is what does the contract allow or not. Well, the contract contemplates the acquisition, marketing, packaging, storing, and transportation of a product that is derived from a coal power plant, and specifically I call it SIPC power plant out of Illinois. And the product is derived from Unit 123 from SIPC. This product is picked up, developed, marketed, and utilized in the mining industry. My client enters into this contract for those purposes of working together to sell, prepare, store, package, transport. If you forget everything else I've said today, judges, please remember this. In today's business world and in contractual relationships, there still must be an implied covenant of good faith and fair dealing. And why I say that is if, as I believe happened here, you allow one group of parties to a contract to dismantle, to attack and destroy the very business entity that they've contracted to participate in, and I'm not just talking about a competitive business. I'm talking about dismantling the business that they've contractually arranged and agreed to assist, to strengthen. We have substantial problems without a covenant. Do you agree that to the extent someone's not a party to the contract that you don't have an implied covenant of good faith and fair dealing claim against them? I would agree. It attaches to, and whether it be an oral contract or a written contract, it attaches to contractual relationships between business entities. Right. And I wholeheartedly agree with that, Judge. But the point I want to emphasize, and again, it's the point that's emphasized in the New Mexico case of Gilmore v. Duderstadt that the Wyoming Supreme Court later adopted in Scher, and again, that is the implied covenant of good faith and fair dealing requires that neither party commit an act that would injure the rights of the other party to receive the benefit of the agreement. Now, I hear what you're saying is, well, what if the contract itself says you're allowed to injure the rights of the opposing party? And that's where the transactional attorney in me is troubled, because I don't know how you can draft a contract effectively with parties and exclude the covenant of good faith and fair dealing. Well, you can include provisions in your contract, can't you, that prohibit people from competing, prohibit people from using trade secrets, different things like that. But where does the list end? Well, to take us beyond the covenant of good faith, and again, I'm talking about a business transaction and entity where your business partners that you believe are working with you, working towards the benefit of the business entity, are in fact gleaning, gathering information from top to bottom and representing to you throughout this period of time that, yes, we're on board, we are working together for this common interest and for the benefit of all of us. And then three years into that relationship, you discover that from top to bottom, they've been renegotiating and undercutting, and I use the term undermining literally and figuratively, the ability for you to perform your conditions under the contract. It really so much rises upon this concept of an implied covenant that we're going to work together. I hear what you say, why can't you as a transactional lawyer add language and language and language and language that says, no, you can't do this, you can't do that, you can't do that, you can't push me off the train. At the end of the day, I'm pleading for this court to hold fast to the principles of this implied covenant of good faith and fair dealing. Would you want to address to me your claim of fraud? Yes. I'm hearing everything, but what I'm seeing you raise on the issue here, so your first one was in regards to the fraud claim, so let me hear your argument in regards to that. Thank you, Judge. Out of the gate, one of the important concepts in regard to the fraud is it was dismissed by the lower court, and it was dismissed based upon the economic loss rule, and then later the contract claim is dismissed without addressing what does this do to the fraud claim. Well, I mean, so the contract claim was dismissed on the notion that there was no breach, right? Later. Yes, later. Yes. And the fraud claim, that doesn't mean it's erroneous to apply the economic loss rule, does it? I mean, because I don't think the court ever said there was no contract. The court acknowledged there was a contract and just said there was no breach, and I think the gist of dismissing the fraud claim was you were claiming that their action in breaching the contract was also fraud, and that's how the court came up with that, right? And what I have to be totally candid with the court, I did not, I'm appellate counsel. I was not in the trenches, so I can't give you the minutiae of what happened. Well, let me assure you that his description should be your argument. But at the end of the day, to focus the fraud claims themselves, there are so many that the lower record is replete. Well, but that's my problem. Your argument here, and you've alleged this fraud claim was error with what the trial court did, and I've not heard an explanation of how the trial court erred yet. Well, let me begin with the material facts that were disputed, and before I go too far, I should reference that the standard of review for the non-moving party is that the courts accept and believe the evidence, and all justifiable inferences are to be drawn to the non-moving's point of view. Okay, that's your second position where you say that there are many disputed material facts, so that's what you're going to give us right now? Yes, Your Honor. Thank you for your patience. The real focus is that three-year period and the record below wherein representations are being made to my client over and over and over again that please tell us how you store this material, please tell us what kind of bags you use, please tell us where you're purchasing the material from. We're in the business. Partners had never bought so much as one gram of the bed ash from Unit 123. Representations that, no, we are working together. Don't worry about any concerns that you may have. We are not splitting our activities. Our business interest is the same as your business interests. Telephone conversations, e-mails, wherein my client is worried about what is going on. And then, as we reference within our brief, three years later, August of 2017, my client is pushed off the train. The business that he had believed they were working so hard to preserve and protect had been dismantled from acquisition to sales that he was unable to perform, unable to do the work that he had based upon these representations. And these are the kind of representations that a trier of fact should review to understand, was this, in fact, a material misrepresentation of a known untruth and did my client rely upon that information? Counsel, I know you were wanting to reserve two minutes of your time, but that takes me to your third issue in regards to the motion to alter, amend the judgment, how the trial court committed an error there. What's your argument that how the trial court erred? The trial court had an opportunity to focus on the pure fraud issue again, and we believe that the trial court should have addressed that issue. Importantly, we believe that the fact that the implied covenant of good faith and fair dealing is an independent and separate action that survives the breach of contract, we believe the court should have acknowledged that and provided my client with an opportunity to argue their case, to get it in front of a jury. So thank you. I'd like to reserve my remaining time. Thanks. Thank you. Mr. Hanson. Thank you, Your Honor. May it please the court. Counsel. My name is David Hanson. Along with my co-counsel, James Burroughs, we represent three appellees, Crown Products and Services, Incorporated, whose president and CEO is Doug Simmons. He's seated here in the courtroom. We represent AB Rubber, Incorporated, a dissolved entity, and Arthur Brown personally. Mr. Brown is also in the courtroom today. I have one question when you get started, and that's in regards to there's a pending motion. I thought I had that written down. Anyway, to keep it sealed, do you intend to renew that motion here to keep those documents that you're asking to be sealed, to stay sealed? The appellee's limited small universe of documents to remain sealed, yes. But I was going to start with what brings us here today is a case about secrets. And the appellant, MKI, has on three occasions failed to tell this court why the briefs in this court should remain sealed, the briefs that contain the secret sauce and the so-called secrets. And this court, as this court noted, those are now unsealed. Everyone in this courtroom can read those briefs. Everyone out who has access to them can read those briefs. That's, to us, where we start. This was a case at its core about secrets. We get to the implied covenant. It did not surprise us that that would be where appellant would go today. It's really all they have left because the secrets claims are so weak. And when those fall, everything in the case falls. And what we're left with is an attempt, using the implied covenant, to breathe something into the contractual, to imply it in, something that wasn't there. Is there any, I mean, I think maybe we seal more than we should. After this litigation and after all these companies now that are producing the similar product and all, is there really any argument for continuing to seal this material because it contains business secrets? Certainly, the appellees believe in open courts that are not here to upend some broad statement like that. There are limited, limited cases where they should be sealed. And when the court asks for the parties to tell the court why they should be sealed, the parties need to respond. We did that for a limited number of sealed pieces of information, which this case is not really about. Instead, the ones that it is about, the case the plaintiff brought their claims on, are the ones that are now open to the world. And those are the, because appellant feel. Well, that's the point of why I ask you. I see no reason, unless you can give me a real good one, to keep these matters sealed. That's why the question was asked to begin with. For the, the response we'd say is the defendant appellees did not come into court. They were hailed into court as defendants. And so they didn't put their business information out there and try to seek a remedy from another party. They did. Well, I don't mean, I don't need to put, I'm wasting your time on how you want to argue. So we'll decide whether we're going to keep it sealed or not. So excuse the interruption. I just wanted to know that. Why don't you move on to the covenant of good faith and fair dealing issue? Yes. Yes, Your Honor. We start that issue by recognizing that, yes, yes, the implied duty is implied into all contracts under Wyoming law. But the duties that are found implied cannot create new and expanded duties of rights. That's what the district court found that the appellant had failed to do. To point to him any independent reason why there's a duty breach. The only alleged breaches were of the express duties. And the MKI failed to address anything other than that. For that reason. There's just a feeling in this case that here you think you've got a contracting party, and that contracting party really is going about the business of establishing a competitor. And that's just not the way contract good faith usually is interpreted. I want to address that feeling. And I think the feeling comes from a misreading of the contract. The contract was signed, the Crown agreement was signed in 2014. What do the undisputed facts tell us about what happened in 2014? It was Crown who brought that standard NDA to MKI because they were going to have a vendor relationship, not some joint venture about some newly discovered bedash from SIPC. That would, Mr. Black of MKI didn't even know about SIPC in March of 2014, the undisputed date that he signed the agreement with Mr. Simmons. Why did they sign that agreement in 2014, in March? It's because they were going to be selling mining material such as glycerin and other liquid chemicals that the mining folks use. And Mr. Black's company, MKI, would be a vendor to Crown. Crown was already in the mining industry, had been for decades, and had glycerin vendors. MKI was going to be one of the glycerin vendors. They set up a standard NDA, and this is why it's so important. The day after and the years after that was signed, the Crown was free to look for other glycerin vendors, free to come up with its own glycerin, and free to compete with MKI in glycerin sales. Right there, that's what's important. From the beginning of this contractual relationship in 2014, Crown always, always had the right to compete. The Crown agreement is not a non-compete. It is an NDA. It says— When you talk about glycerin, are you talking about this material, like the BEDCUR 123 and all? Is that what you're—are you talking about a completely different product? It's a completely different product, and it's instructive that it's different because— So what does that have to do with this case? It has everything to do with the case because it shows an undisputed fact where we competed with MKI. Crown competed with MKI. On different products. But that's not what this case is about. That's not what this contract is about. The contract is about anything that the parties share with each other, any information through the life of that contract that they share with each other, and you cannot use the confidential stuff. And glycerin was never in this case because it was never alleged to be confidential. BEDCUR, or this BEDASH, was alleged at one time to be confidential. It appears that that—well, that's what the district court found. It is not secret. So if it's not secret, this BEDCUR becomes indistinguishable from the glycerin. That's why I brought up glycerin. Are there claims here about your misusing, sharing, competing in the glycerin business? There are no claims about that. I'm just mystified. Proceed. I just want to clear up any mystery because if BEDCUR is nothing more special than glycerin was, then we can do with BEDCUR what we did with glycerin, and that was compete with them, come up with our own BEDCUR, go to SIPC and source it for ourselves, and the very next day go out and sell it in a better package and beat them in the marketplace. That's what we did with glycerin. That's why I keep mentioning it. And we can do it with BEDCUR unless it's secret. I think what you're getting at is the underlying contract that would give rise to this implied duty is the NDA. That's exactly right. Right. Yes. And when you read the clear language, unambiguous language of the NDA, it's nothing more than don't use my confidential information, don't disclose it, the standard NDA provisions that parties enter into. It is not a joint venture. Throughout the briefs, MKI refers to promises made to nurture their BEDCUR business. It's not in the contract. You won't find any promises to nurture the business. The only promise made is if you give us something confidential, we won't use it. Likewise, you won't use anything we give you that's confidential. Standard NDA language. So that, and this reaches all the claims in the case, so that when Mr. Brown, as much in the briefs about Mr. Brown's visit to the SIPC facility, whether that was surreptitious or clandestine, there's a fact lurking in the briefs that is very important to mention. When Mr. Brown shows up at the facility and is given a tour, he's escorted, he's let in, he's wearing a crown shirt with a crown emblem on it. That's something that I hope the court just remembers as it's reading through the briefs. We often say when there are different contracts applying to different parties, sometimes we'll say, well, what hat was he wearing figuratively? This is literally wearing the crown shirt, and they knew he was there on Crown's behalf. Why is that important? Because the AB rubber agreement, we acknowledge, has stronger loyalty provisions to it. But the court found below that Mr. Brown was not acting as AB rubber when he visited. He acted as crown. He had told MKI, I've gone over, a year earlier, he told them, I've gone to work for Crown, parentheses, that company with whom you have no non-compete. And so that's how he should be treated from this point on. That's why there's nothing wrong with his visit. That's why it makes sense that he was there, and if the record, as it shows in the briefs, he was there first to see their glycerin facility, there's that word again, because he's seeing whether MKI should continue to be a good vendor of that not special commodity called glycerin. Then he says, while we're here, can we go to the bed cure facility too? Another non-secret commodity, just like glycerin, because I want to see if your glycerin packaging and bed cure packaging is up to snuff, because I've got to report back to Mr. Simmons at Crown, my company, I need to know whether we're going to keep you on as our vendor. We are free to find another bed cure vendor. We are free to find other glycerin vendors. That's the business we're in when we are Crown. That's critical to this case. It means there's nothing wrong with what was done. Did Crown have multiple vendors of these mining products? Of glycerin, certainly, and then with SIPC, sorry, with the bed cure, it wasn't getting its bed cure from someone else. It got its bed cure itself. It went to the source, and here's the fundamental understanding, but it's been at the center of MKI's case from the beginning. There was no exclusive. Your Honor, you could call SIPC and say, can I buy this bed ash? I hear it's wonderful. I hear it's the wonder dust. And SIPC would not say, sorry, we have an exclusive with Bankston Creek Corporation. Instead they say, if Bankston ever buys all of it, I guess you won't have a chance to buy it. But that's all the contract says, and it's unambiguous language. It says, Bankston, you have a right of first refusal. You could buy up to 40,000 tons of this dust we produce annually. They never did. They went to, I think, 15,000 at the maximum. That means SIPC and the uncontroverted testimony of SIPC's Mr. Leonard Hopkins, they were trying to push this stuff out, get rid of it. It's just waste that we have to pay to dispose of. And it wasn't a secret that this stuff was good for stabilizing roads. Absolutely not. The court found that on the record below many different ways that it was not secret, including the last and latest was when JMO, yet another entity, J-M-O, went to SIPC and asked the question, can we get some of this SIPC bed ash dust? They were told yes. And so their principal, whose name is Orr, said we're back in the bed ash business, and they became someone who could source this exact same material. I mention that name Orr because the briefs also, you'll recognize that name, because a Mr. Bob Orr was the first to do this in 2008, six years before Mr. Black and MKI even got into and discovered it, but that in air quotes, discovered this bed ash. An entity called Freedom had done it in 2008. That's the death knell. Isn't one of the things going on here, too, that apparently the major purchaser of this stuff found out that they might have multiple potential sources? Are you referring, Your Honor, to Murray Energy? Yes. Yes, and that's expressly allowed, as it logically should be under an NDA. If a third party says, as Mr. Rowe of Murray did when he called Mr. Simmons of Crown, can you match this? It's done every day in business. Can you match this? I'm getting my bed cure from this party. Can you match it? How does Mr. Simmons respond? I think we can. He had to think in his mind, if I can get my hands on any, and of course the answer to that is yes, uncontroverted. You can just go to SIPC and ask for it. Leonard Hopkins is trying to get rid of it. He's selling it to J-Mote. He had been selling it to Freedom, and he's continuing to sell it now to Crown and MKI. It just simply is not a secret source case. With that, the dominoes start falling through this amended complaint. No trade secrets claim, no state law or federal trade secrets claim, and all of the duties on the implied covenant is nothing more than trying to breathe in independent and newly expanded rights, which the cases tell us you cannot do. That's what the implied covenant cannot do. I mean, low on time, I just lead the court with that order, is to look at the core, but there's being no secret, and then look back to 2014 when the Crown agreement was signed and ask, was MKI, was bed dust even on the horizon? And it was not. I see the red light is on. Can I just wrap this up? You can go ahead and wrap up. At 2014, a simple NDA was entered, and what all the complaint of behavior that happened in 2017 was nothing more than a party exercising the rights it always had since 2014. If bed cure is not secret, it's not secret, it's just like glycerin, it's a commodity, and there's no wrongdoing whatsoever, that knocks out fraud, it knocks out the implied covenant as well. Thank you. Thank you. Mr. Walker, you had a bit of time left, I think. A minute and twenty seconds. Thank you, Judge. What you have just heard is what gives me great concern about the right of my client to have a trial and triers of fact. You've heard over and over again this fact, this fact, this fact, this fact, but as you look at the record, there is some very contested issues on some of these things. In a nutshell, this case represents to me a very large onion that has lots of layers and lots of factual layers and lots of legal layers and legal issues to address. What gives me tremendous concern, judges, is the notion of a party entering into a contractual relationship, a business relationship, to market a product and then have the party that you've contractually agreed to sell this product, to get it out, to transport it, and then that party doesn't just go, this is not competing lemonade stands. This is a unique concept. And to go out and dismantle your business internally and then set up the parallel and competing business, that's a question that juries need to hear. Thank you so much, judges. Thank you. All right, the case will be submitted and counsel are excused.